## 10030

### STATE v. WIDEMAN.

#### (96 S. E. 688.)

1. CRIMINAL LAW—EVIDENCE—RES GESTAE.—Where a person who had just been shot went into a house and in answer to a question said that J. A. had shot him, but when challenged by J. A. said that he meant J. W., the latter statement was admissible as well as the former as part of the *res gestae.*

2. CRIMINAL LAW—REVIEW—RES GESTAE—DISCRETION OF COURT.—The admissibility of declarations as *res gestae* must necessarily be left to the sound discretion of the trial Judge.

3. CRIMINAL LAW—WEIGHT OF EVIDENCE—QUESTIONS FOR JURY.—The probative value of declarations forming part of the *res gestae* is for the jury.

4. CRIMINAL LAW — REVIEW — DISCRETION — CROSS-EXAMINATION.—In a homicide case, on cross-examination of a State's witness, sustaining objection to question as to whether witness had not lived on "C.'s" place and been driven off by "C.," on whose place defendant had lived and still continued to live, the purpose of question being to show bias, was not reversbile error; no prejudice appearing, and scope of cross-examination being left to sound discretion of trial Judge.

5. HOMICIDE — DYING DECLARATION. — Statements by one that he was shot to death, and was not going to get well, sufficiently showed that he believed that he was *in extremis.*

Before WILSON, J., Abbeville, Spring term, 1916. Affirmed.

Johnny Wideman was convicted of manslaughter, and he appeals.

*Mr. Sam Adams,* for appellant, cites: *As to res gestae:* 47 S. C. 386; 56 S. C. 655; 12 S. E. 26° (Ga.) ; Underhill on Criminal Evidence, sec. 94. *As to bias of witnesses:* 32 Kan. 372; 2 Abb. Pr. (N. Y.) 256. *As to dying declarations:* Underhill on Criminal Evidence, sec. 102; 24 Cal. 24; 9 S. C. 208; 34 S. C. 139; 56 S. C. 374; 13 S. C. 463; 103 S. C. 316.

*H. S. Blackwell, Solicitor,* for State-respondent.

July 17, 1918.

The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

Appellant was tried for the murder of Robert Belcher, also called Robert Jenkins. He was found guilty of manslaughter and sentenced to five years imprisonment. The homicide was committed at "a hot supper" at the house of Maria Dawson. Defendant pleaded "Not guilty," and sought to prove an alibi, by proving that he was in the house, when deceased was shot on the outside. The solicitor admitted that one of defendant's witnesses, who was absent at the trial, would have testified, if he had been present, that he saw John Allen shoot deceased.

The said John Allen was one of the State's witnesses, and testified that he was in the house, and heard a gunshot on the outside; that immediately afterwards deceased ran into the house, where there was a crowd of people, and, on being asked by some one what was the matter, said John Allen shot him; that he walked up to him and said: "Boy, what did you say? You say I shot you?" And he then said: "I don't mean you. John Wideman shot me." Defendant's attorney objected to the testimony on the ground that the alleged statement of deceased was not a dying declaration. But the Court admitted it, as part of the *res gestae*. On cross-examinaion, the witness admitted that he and deceased had at some time previously had a fight.

John Lewis DuBose testified as a witness for the State. At the conclusion of his direct examination, in response to a question from the solicitor, he said that he had no interest in the case. On cross-examination, he testified that the defendant, Wideman, lived on Mr. Clinkscales' place, and that he (witness) had lived there for two years, but was not living there then. Defendant's attorney (Mr. Clinkscales) sought to show bias on the part of the witness by eliciting from him, on cross-examination, that he had been run off the place "on account of some work or disagreement." On

objection by the solicitor, the Court excluded the testimony, saying: "I think you are going too far."

Lemmie Smith, a sister of deceased, testified for the State that she saw deceased about midday on Sunday, after the doctor had told him that he could not live, and he told her that he was shot to death, and that "Will Wideman" shot him. Q. Will Wideman? A. Yes, sir. Q. Is that the defendant here? A. Yes, sir. Q. He says he is Johnny Wideman? A. Well, he is the one. He told me that Johnny Wideman shot him. I am a stranger up there."

Dr. C. C. Gambrell testified for the State that he attended deceased; that he made satisfactory progress toward recovery, until the ninth day after he was shot, up to which time he thought he would get well, and deceased thought so, too; but when he saw him on the ninth day, which was about midday Sunday, preceding the night on which he died, he saw that tetanus was developing, and that he was getting rigid, his head was drawn back, and his throat was becoming paralyzed, so that he could not swallow; that he then told deceased that he would not get well, and, he said, "Yes, doctor, I know I am not going to get well," and, after saying so, deceased told him that John Wideman shot him.

Three witnesses for the State testified that they were present and saw defendant shoot deceased. Three witnesses for defendant testified that they saw him in the house dancing at the time the shot was fired, and that he could not have shot deceased.

The first assignment of error is in admitting the testimony of John Allen, above set out, under the *res gestae* rule. Appellant concedes that his testimony was competent under that rule, in so far as he testified that deceased 1, 2 said that John Allen had shot him; but contends that, when his statement was challenged by John Allen, his modification of it, and the further declaration that he meant to say that John Wideman shot him, was incompetent, because it appeared from the circumstances

that the latter part of the statement was not the spontaneous utterance of his mind made so nearly under the immediate influence of the transaction as to preclude the idea that it was the result of reflection, or design; but that, on the contrary, the circumstances showed that it was an afterthought and the result of reflection, influenced by the presence and fear of John Allen—a man with whom he had previously had a difficulty.

The argument is more plausible than sound. It goes to the credibility of the deceased's statement—what he first said as well as what he said after Allen challenged the truth of his first statement—rather than to its admissibility. His statement, if admissible at all, must be taken as a whole, including what John Allen said to him and his reply, for that was as much a part of the *res gestae* as the question asked him by some one in the crowd, when he first ran into the room, and his reply to that question. The rule that such declarations must appear to be the instinctive utterances of the mind under the immediate influence of the transaction is not so rigid or inflexible that a declarant may not correct an error in his declaration, due to a mere slip of the tongue or a momentary lapse of memory, even though the error be suggested by another, without utterly destroying the probative value of the entire declaration. The correction of such an error does not necessarily or conclusively show that degree of reflection or deliberation outside the immediate influence of the transaction which should cause the declaration to be excluded. Whether it does or not is a matter to be determined in the first instance by the trial Court upon consideration of all the circumstances, just as the Court has to determine the time within which such declarations may be received. The determination of the matter is not always free from difficulty, for it depends upon the consideration of all the circumstances of each case, and, therefore, the admissibility of such declarations must necessarily be left to the sound discretion of the trial Judge.

But, in every case, their probative value is for the jury, who consider all the circumstances under which they are made, the person who made them, the person to whom made, and the witness who testifies to them, and give them such weight as in their judgment they are entitled to in ascertaining the truth of the matter at issue.   No matter with what care the rule may be applied, for reasons that will readily suggest themselves, it is possible for such declarations to be made under circumstances which satisfy every requirement of the law as to their admissibility, and still be the result of that degree of reflection or design which, if certainly known, would cause their exclusion; and, on the other hand, the circumstances, as they are made to appear, may require their exclusion, when, in truth, they are fully within the intent and spirit of the rule.   In *State v. McDaniel*, 68 S. C. 304, 311, 47 S. E. 384, 386 (102 Am. St. Rep. 661), the Court said with regard to the matter:

"Questions of this kind must be very largely left to the sound judicial discretion of the trial Judge, who is compelled to view all the circumstances in reaching his conclusion, and this Court will not reverse his ruling, unless it clearly appears from undisputed circumstances in evidence that the testimony ought to have been admitted or rejected, as the case may be."

The next assignment of error is in limiting defendant's cross-examination of John Lewis DuBose, the purpose of which was to show that the witness was so biased against Mr. Clinkscales, because he had been run off his place, that it extended to all who continued to live on his place, including the defendant.   Aside from the improbability of any one being so foolish and wicked as to allow his prejudice against Mr. Clinkscales, if he had any, to affect his testimony against defendant, merely because he lived on Mr. Clinkscales' place, we must say, as to this, as we have said with regard to the first assignment of error, that the ruling was about a matter (the scope of the cross-exami-

nation) which must necessarily be left to the sound discretion of the trial Judge; and the rule is that a judgment will not be reversed for error in such ruling, unless it be made clearly to appear that there was error, and that it was prejudicial, neither of which has been made to appear in this case.

The last assignment of error is in admitting the dying declaration of deceased, as testified to by his sister and Dr. Gambrell. The contention of appellant is that it did not appear that deceased believed that he was *in extremis* —that death was impending. We think the facts and circumstances stated fully warrant the inference that he did. He told the doctor that he knew he was not going to get well, and he told his sister that he was shot to death. In *State v. Arnold,* 47 S. C. 9, 24 S. E. 926, 58 Am. St. Rep. 867, the deceased said, when approached after he had been shot, "Charlie has shot me to death;" and it was held that the expression showed sufficiently that he regarded himself as being *in extremis* as to let the declaration in as a dying declaration.

Judgment affirmed.